**EXHIBIT A**

| | |
|---|---|
| State of Illinois | ) |
| | ) ss |
| County of St. Clair | ) |

**UNSWORN DECLARATION UNDER PENALTY OF PERJURY
IN SUPPORT OF COMPLAINT FOR FORFEITURE**

I, Steven Jeschke, declare under penalty of perjury the following:

At all relevant times, I have been a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI). The contents of this Declaration are based on information provided to me during the course of my investigation from participants in the criminal activity, from other witnesses, and from other law enforcement officers.

**I.    Overview of the SNAP Program**

1.  SNAP, which is formerly known as the food stamp program, is a federal benefit program intended to assist low-income individuals and families with purchasing food. SNAP is managed by the FNS and administered by state agencies. The Illinois Department of Human Services (IDHS) is responsible for administering the SNAP program in Illinois. Recipients of SNAP benefits in Illinois receive their allotted SNAP benefits electronically on an Electronic Benefits Transfer ("EBT") card, commonly known as a "LINK card."

2.  A recipient may use the allotted SNAP benefits on his/her LINK card to purchase eligible food items from authorized retailers. SNAP benefits may not be exchanged for cash. SNAP benefits also may not be used to purchase alcohol, tobacco, hot foods, food sold for on-premises consumption, and non-food products, such as cleaning supplies, toiletries, cosmetics, pet food, medicines and vitamins. *See, e.g.*, 7 C.F.R. §§ 274.7(a), 278.2(a).

3.  Not all businesses are authorized to participate in SNAP. For a store to become eligible to accept SNAP benefits, a store operator is required to complete, sign, and submit a Supplemental

Nutrition Assistance Program Application for Stores, otherwise called a Form FNS-252. A Form FNS-252 requires the store operator to provide certain information, including: (1) the store's name and location; (2) names and addresses of all officers, owners, partners, and members of the business; (3) the store's actual or estimated annual sales; (4) information related to the types of products sold by the store; and (5) information regarding the business's integrity and reputation, including whether any officers, owners, partners, or members of the business previously were denied, withdrawn, suspended, or fined because of SNAP violations. As part of the authorization process, the FNS may require a visit to a retail store to determine its eligibility, and the FNS also may require the applicant to provide additional information or documents relating to the nature and scope of the business and the business's integrity and reputation. See 7 C.F.R. § 278.1. Once the FNS authorizes a retailer to redeem SNAP benefits, the retailer is issued a SNAP authorization card and may conduct SNAP transactions using the FNS number it was assigned during the application process.

**II.    LINK Card Transactions**

4.    A SNAP benefits recipient can use the SNAP benefits on his/her Link card to make eligible food purchases by swiping his/her Link card through a point-of-sale device and entering his/her personal identification number ("PIN"), similar to the process used in traditional debit card transactions. A retailer may obtain a point-of-sale device capable of accepting Link cards through the State's contractor for SNAP or through a third-party processor.

5.    In Illinois, USDA reimbursement for SNAP benefits is administered by Xerox State and Local Solutions, Inc. ("Xerox"), through a contract with the Illinois Department of Human Services. An Illinois retailer authorized to redeem SNAP benefits, may contract directly with Xerox to process its SNAP transactions or it may contract with a third-party processor. In either scenario,

the completion of a SNAP transaction requires wire communications and electronic funds transfers to be made in interstate commerce.

### III. APPLICABLE LAWS

6. SNAP recipients may use their SNAP benefits only to purchase eligible food for the household, 7 C.F.R. § 274.7(a), and they may use their SNAP benefits only at retailers that have been approved to participate in SNAP, 7 U.S.C. § 2016(b).

7. Retailers may accept SNAP benefits only in exchange for eligible food; they are not allowed to accept SNAP benefits in exchange for cash. 7 C.F.R. § 278.2(a). Retailers also are not allowed to accept SNAP benefits in payment of interest on loans and for any other nonfood use. *Id.* Buying, selling, or otherwise exchanging SNAP benefits for cash or consideration other than eligible food is commonly referred to as "trafficking" SNAP benefits. *See* 7 C.F.R. § 271.2.

8. Federal law prohibits SNAP benefits "trafficking." 7 U.S.C. § 2024(b). Specifically, Title 7, United States Code, Section 2024(b)(1) prohibits the knowing use, transfer, acquisition, alteration, or possession of SNAP benefits in any manner contrary to Title 7, United States Code, Chapter 51 or the regulations issued pursuant to that chapter. A violation of § 2024(b)(1) involving SNAP benefits of $100 or more is a felony. *Id.*

9. Federal law also prohibits individuals from presenting, or causing to be presented, SNAP benefits for payment or redemption, knowing those benefits to have been received, transferred, or used in any manner in violation of Title 7, United States Code, Chapter 51 or the regulations issued pursuant to that chapter. 7 U.S.C. § 2024(c). A violation of § 2024(c) involving SNAP benefits of $100 or more is a felony. *Id.*

10. Under 7 U.S.C. § 2024(f), "[a]ll property, real and personal, used in a transaction or attempted transaction, to commit, or to facilitate the commission of, a violation (other than a

3

misdemeanor) of subsection (b) or (c), or proceeds traceable to a violation of subsection (b) or (c), shall be subject to forfeiture to the United States . . . ." 7 U.S.C. § 2024(f)(1)-(2). Under § 2024(f)(3), however, "[n]o interest in property shall be forfeited under this subsection as the result of any act or omission established by the owner of the interest to have been committed or omitted without the knowledge or consent of the owner."

11. Title 18, United States Code, Section 371 prohibits persons from conspiring to commit an offense against the United States or defraud the United States or a U.S. agency, where one or more members of the conspiracy commit an act in furtherance of the conspiracy. 18 U.S.C. § 371.

12. Persons who scheme to defraud the government through the trafficking of SNAP benefits, and cause interstate wires to be used in furtherance of the scheme, also may commit wire fraud, in violation of Title 18, United States Code, Section 1343. Persons who engage in a conspiracy to commit wire fraud also violate Title 18, United States Code, Section 1349. Proceeds of wire fraud schemes are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C). Section 981(a)(1)(C) provides for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of [certain listed provisions of Title 18] or any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of [Title 18]), or a conspiracy to commit such offense." 18 U.S.C. § 981(a)(1)(C). Wire fraud is an offense constituting "specified unlawful activity" as defined in § 1956(c)(7). *See* 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1).

### IV. Overview of the Investigation

13. As explained in more detail below, investigating agents have analyzed the SNAP redemptions from EGYPTIAN CORNER, conducted undercover SNAP transactions at EGYPTIAN

CORNER, and analyzed SNAP transactions records and bank account records for EGYPTIAN CORNER.

14.    As part of the investigation, investigating agents used a confidential informant ("CI") to conduct undercover SNAP transactions involving the exchange of SNAP benefits for cash at EGYPTIAN CORNER. In each of the undercover transactions, the CI met with investigating agents prior to the transactions. Investigating agents provided the CI with a Link card and PIN to use in the transactions. For each transaction, investigating agents also equipped the CI with an audio and video recording device to record the transactions. The CI met with investigating agents at a predetermined location before and after conducting the undercover transactions.

### V.    Background Regarding Subject Premises

#### Subject Premises' Participation in the SNAP Program

15.    According to FNS records, EGYPTIAN CORNER was authorized to accept USDA SNAP benefits on or about May 11, 2011, and was designated FNS authorization number 0304404. According to FNS records, EGYPTIAN CORNER is owned by SUFIAN AHMAD QASEM ("QASEM") and DEAN AHMAD AMLEY ("AMLEY").

16.    An electronically submitted SNAP application form (Form FNS-252-E) was submitted on behalf of EGYPTIAN CORNER on April 5, 2011. The application stated that EGYPTIAN CORNER opened for business on April 1, 2011. The application identified EGYPTIAN CORNER as a privately held corporation in the name of EAST MAIN SHELL, INC., dba EGYPTIAN CORNER, located at 534 East Main Street, Carbondale, Illinois and listed QASEM as the owner. According to FNS records, AMLEY was added as an owner and President of the corporation on December 6, 2013, with an effective date of April 5, 2011. The Form FNS-252-E stated that EGYPTIAN CORNER would be open Monday through Sunday from 6:00 a.m. to 12:00 p.m. and

estimated that EGYPTIAN CORNER's total retail sales, including sales for non-food items and services, would be approximately $6,500 per day.

17. An electronically submitted SNAP Reauthorization Application for Stores form (Form FNS-252-R) was submitted on behalf of EGYPTIAN CORNER on January 29, 2016. This Form FNS-252-R indicated: 1) EGYPTIAN CORNER was still open for business at the same location; 2) the updated hours of business are Monday through Sunday, 6:00 a.m. to 11:00 p.m.; 3) AMLEY and QASEM are still owners of EGYPTIAN CORNER; 4) retail sales for tax year 2015 totaled $1,017,609; and 5) no officer, owner, partner, and/or member is currently receiving SNAP benefits.

18. Although the Form FNS-252-R certified that no officer, owner, partner, and/or member is currently receiving SNAP benefits, the investigation revealed that AMLEY was in fact receiving SNAP benefits in the amount of $400 per month. AMLEY continued to receive SNAP benefits through at least September 2020 in varying monthly amounts.

19. As part of the reauthorization application process, a contractor with FNS conducted a site visit of EGYPTIAN CORNER. On August 15, 2016, a visit was made to EGYPTIAN CORNER to determine if the store was eligible to continue to participate in SNAP. The Survey Form for FNS indicated that the store was: 1) approximately 1100 square feet; 2) located in an urban and commercial area; 3) had one (1) cash register/check out station; 4) had no (0) shopping carts available; 5) had less than ten (10) shopping baskets available; 6) had no (0) optical scanners; and 7) had one (1) POS device for EBT benefits inside store. The contractor inventoried the eligible food items EGYPTIAN CORNER had for sale, took photographs of the store, and drew a diagram of the store's layout at the time of the visit.

20. In 2018, FNS conducted an investigation of EGYPTIAN CORNER in order to ensure that the store was complying with SNAP regulations with regard to the sale of ineligible items and/or

the exchange of cash for SNAP benefits. The investigation revealed that the store's employees were exchanging ineligible items for SNAP benefits on at least five (5) occasions. FNS sent a letter to EGYPTIAN CORNER dated February 4, 2019 explaining that their investigation revealed evidence that violations of the SNAP regulations occurred and that EGYPTIAN CORNER was being charged with accepting SNAP benefits in exchange for ineligible non-food items. The letter further explained that the violations warrant a disqualification from the SNAP for a period of 1 year, or under certain conditions, an imposed civil money penalty in lieu of the disqualification. In response to the letter, AMLEY retained an attorney that negotiated with FNS to allow for a $5,982 civil money penalty in lieu of the disqualification.

21. As noted above, EGYPTIAN CORNER received authorization to participate in the SNAP program in 2011. From approximately June 2011 through August 2020, EGYPTIAN CORNER redeemed approximately $971,880.61 in SNAP benefits, despite the store's reported annual food sales of $36,830.

22. On average, EGYPTIAN CORNER redeemed more than $8,755 in SNAP benefits per month, far exceeding the estimate of $3,069 in total monthly retail sales contained in EGYPTIAN CORNER's SNAP application. The $3,069 estimate, moreover, was an estimate of *total* retail sales—not just sales of eligible food products to SNAP beneficiaries.

23. In addition, EGYPTIAN CORNER's total SNAP redemptions and average SNAP transaction amount from June 2011 through August 2020 far exceeded the average figures for comparable stores in Jackson County over that same time period. In fact, the EGYPTIAN CORNER's total SNAP redemptions for this time period were more than 3 times the average total redemptions for "convenience stores" in Jackson County.

24. Based on my training and experience, and the training and experience of other agents who investigate SNAP benefits fraud with whom I have consulted, the amounts by which EGYPTIAN CORNER's total SNAP redemption figures exceed the average figures for comparable stores in Jackson County are indicative of SNAP trafficking.

25. Beginning in April 2020, Illinois did start issuing Pandemic EBT (P-EBT) benefits in addition to the regular SNAP EBT benefits to recipients. Because of this additional EBT funding, some increase in SNAP redemptions at retail locations would be expected. However, because EGYPTIAN CORNER redeemed SNAP benefits in excess of their estimated retail sales prior to the issuance of the P-EBT benefits, the P-EBT benefits do not account for the entire increase in total redemptions for the time period of April 2020 through August 2020.

### V. Undercover Transactions at Subject Premises

26. On or about August 12, 2019, a CI received $150.00 cash in exchange for leaving a LINK card with a balance of approximately $357.00 in SNAP benefits at EGYPTIAN CORNER. The transaction was audio and video recorded. During the transaction, the CI entered the store and approached the store clerk, later identified as KHALID MOHAMED ABDELKARIM MOHAMED (KHALID). The CI gave KHALID the LINK card and the associated PIN and KHALID called AMLEY on the phone. AMLEY instructed KHALID to give the CI the $150.00 cash, which was taken from the store cash register, in exchange for the LINK card. Based on my training and experience, and knowledge of the investigation, including the subsequent transaction, the $150.00 cash payment was received as a payment for the use of approximately $300.00 in SNAP benefits on the LINK card, or 50% of the value. Furthermore, the LINK card is then typically used by the purchaser, in this instance EGYPTIAN CORNER, to shop for inventory to stock the store or for personal groceries. Transaction records for the LINK card used by the CI indicate a balance inquiry

8

was conducted on the card at EGYPTIAN CORNER at the time of the transaction. Transaction records and further investigation revealed that the LINK card sold to EGYPTIAN CORNER by the CI were used in the following instances:

| Date | Location Used | Amount Used | Identity of Shopper |
|---|---|---|---|
| 8/13/19 | Save A Lot, Carbondale, IL | $95.52 | **KHALID** |
| 8/14/19 | Fresh Foods, Carbondale, IL | $16.31 | Unknown |
| 8/14/19 | Fresh Foods, Carbondale, IL | $4.58 | Unknown |
| 8/14/19 | Save A Lot, Carbondale, IL | $12.36 | **FAHADUDDIN and 1 unidentified employee** |
| 8/21/19 | Save A Lot, Carbondale, IL | $118.72 | Unknown |
| 9/1/19 | Aldi, Carbondale, IL | $14.44 | Unknown |
| 9/3/19 | Save A Lot, Carbondale, IL | $81.61 | **FAHADUDDIN** |

27. On or about September 13, 2019, a CI entered EGYPTIAN CORNER and received $250 cash in exchange for leaving a LINK card with a balance of approximately $561 in SNAP benefits at EGYPTIAN CORNER. The transaction was audio and video recorded. During the transaction, the CI entered the store and approached AMLEY. AMLEY instructed a store clerk, later identified as KHALID, to check the balance on CI's LINK card (confirmed by transaction records). After determining that the LINK card had a balance of approximately $561.00, AMLEY instructed KHALID to provide the CI with $250.00 cash. KHALID can be seen on the undercover video recording leaving the cash register area and walking toward the back of the store before returning. AMLEY is then heard counting out $250.00 cash to the CI in exchange for the CI leaving the LINK card at the store. Transaction records and further investigation revealed that the LINK card sold to EGYPTIAN CORNER by the CI were used in the following instances:

9

| Date | Location Used | Amount Used | Identity of Shopper |
|------|---------------|-------------|---------------------|
| 9/15/19 | Save A Lot, Carbondale, IL | $47.76 | **Unidentified employee** |
| 9/26/19 | Save A Lot, Carbondale, IL | $33.60 | **Unidentified employee** |
| 9/27/19 | Walmart, Carbondale, IL | $1.98 | **Unidentified employee** |
| 10/8/19 | Kroger, Carbondale, IL | $76.45 | **AMLEY** |
| 10/9/19 | Schnuck's, Carbondale, IL | $11.94 | **AMLEY** |
| 10/10/19 | Pete's Fresh Market, Bridgeview, IL | $132.18 | **Unknown** |
| 10/10/19 | Alwatan Bakery, Bridgeview, IL | $67.50 | **Unknown** |
| 10/11/19 | Save A Lot, Carbondale, IL | $80.80 | **Unidentified employee** |

28.     On or about October 15, 2019, a CI entered EGYPTIAN CORNER and received $200 cash in exchange for leaving a LINK card with a balance of approximately $657[1] in SNAP benefits at EGYPTIAN CORNER. The transaction was audio and video recorded. During the transaction, the CI called AMLEY from EGYPTIAN CORNER location to inquire about receiving payment for the LINK card still in the possession of EGYPTIAN CORNER. AMLEY informed the CI he was still about 15 minutes away from the location, and asked the CI "you're trying to sell it right?" When the CI said yes, AMLEY instructed the CI to "tell them to give you $200.00 and a pack of squares just like we usually do." The CI then entered EGYPTIAN CORNER and encountered a male and a female behind the cash register. The CI handed the phone to the male, and told him "it's Dean, Bossman (AMLEY)." The male spoke to AMLEY on the phone and walked to a back room of the store. The female followed the male. A third employee, a male later identified as MOHAMMAD FAHADUDDIN (FAHADUDDIN), came out of the back room to talk to the CI and asked CI if the LINK card was his and how much he gets. FAHADUDDIN gave CI $200.00 out of two different drawers and a pack of Newport 100s cigarettes. Transaction records for the LINK card used by CI

---

[1] The LINK card remained in possession of EGYPTIAN CORNER since the time of the initial UC transaction. The LINK card was reloaded with $548.00 in SNAP benefits before the entire previous balance paid for during the September 13, 2019 UC transaction was used by EGYPTIAN CORNER.

10

indicate a balance inquiry was conducted on the card at EGYPTIAN CORNER at the time of the transaction. Transaction records and further investigation revealed that the LINK card sold to EGYPTIAN CORNER by the CI were used in the following instances:

| Date | Location Used | Amount Used | Identity of Shopper |
| --- | --- | --- | --- |
| 10/16/19 | Kroger, Carbondale, IL | $43.41 | Unknown |
| 10/16/19 | Save A Lot, Carbondale, IL | $71.64 | **AMLEY** |
| 10/17/19 | Alwatan Bakery, Bridgeview, IL | $26.40 | **unknown** |
| 10/17/19 | Sam's Club, Marion, IL | $100.42 | Unknown |
| 10/21/19 | Save A Lot, Carbondale, IL | $9.79 | Unknown |
| 10/21/19 | Save A Lot, Carbondale, IL | $7.12 | Unknown |
| 10/29/19 | Save A Lot, Carbondale, IL | $6.46 | Unknown |
| 10/31/19 | Save A Lot, Carbondale, IL | $17.31 | **Unidentified Employee** |
| 10/31/19 | Walmart, Carbondale, IL | $14.90 | Unknown |
| 10/31/19 | Walmart, Carbondale, IL | $1.99 | Unknown |
| 11/1/19 | Save A Lot, Carbondale, IL | $53.22 | **Unidentified Employee** |
| 11/3/19 | Kroger, Carbondale, IL | $65.15 | Unknown |
| 11/3/19 | Aldi, Carbondale, IL | $56.70 | **AMLEY** |
| 11/4/19 | Save A Lot, Carbondale, IL | $116.88 | **AMLEY** |
| 11/5/19 | Save A Lot, Carbondale, IL | $45.32 | **AMLEY** |
| 11/7/19 | Alwatan Bakery, Bridgeview, IL | $0.01 | Unknown |
| 11/7/19 | Alwatan Bakery, Bridgeview, IL | $20.00 | Unknown |

29.     On or about September 18, 2020, a CI entered EGYPTIAN CORNER and received $200 cash in exchange for leaving a LINK card with a balance of approximately $405 in SNAP benefits at EGYPTIAN CORNER. The transaction was audio and video recorded. During the transaction, the CI entered the store and approached the store clerk, FAHADUDDIN. FAHADUDDIN gave the CI $200.00 out of the cash register and told CI to pick up the card in a couple days and that it would be left in the plastic cigar case near the cash register.[2] Transaction

---

[2] The CI informed agents that other LINK cards that were ready to be picked up were visible in the plastic cigar case with paper wrapped around them.

records for the LINK card used by the CI indicate a balance inquiry was conducted on the card at EGYPTIAN CORNER at the time of the transaction. Transaction records and further investigation revealed that the LINK card sold to EGYPTIAN CORNER by the CI were used in the following instances:

| Date | Location Used | Amount Used | Identity of Shopper |
|---|---|---|---|
| 09/18/20 | Walmart, Carbondale, IL | $2.23 | Unknown |
| 09/19/20 | Sam's Club, Marion, IL | $87.28 | **FAHADUDDIN** |
| 09/19/20 | Sam's Club, Marion, IL | $155.88 | **FAHADUDDIN** |
| 09/21/20 | Egyptian Corner, Carbondale, IL | $41.25 | Unknown |
| 09/23/20 | Aldi, Carbondale, IL | $10.94 | Unknown |

**VI.    Surveillance of Subject Premises and Related Transaction Analysis**

30.   On April 17, 2020, investigating agents conducted surveillance on EGYPTIAN CORNER and observed AMLEY arrive in a Red Dodge pickup truck at approximately 1234 hours. At approximately 1344 hours, an unidentified black male was observed walking to the store and entering EGYPTIAN CORNER. Transaction records for EGYPTIAN CORNER indicate a SNAP transaction was conducted at EGYPTIAN CORNER at approximately 1344 hours in the amount of $3.00 using a LINK card registered to J.C. A second transaction occurred at EGYPTIAN CORNER using this same LINK card at approximately 1406 hours in the amount of $150.52. Based on my training and experience, a SNAP transaction of such a large dollar amount as this that occurs at a convenience store such as EGYPTIAN CORNER's is indicative of SNAP trafficking.

31.   Transaction records for EGYPTIAN CORNER indicate that on April 16, 2020 at approximately 1723 hours, a SNAP transaction occurred at EGYPTIAN CORNER in the amount of $120.25 using a LINK card registered to M.W. Further investigation revealed that a SNAP transaction occurred at a local Wal-Mart using this same LINK card on April 17, 2020 in the amount

of $100.00 by an unidentified black male and the unidentified female employee of EGYPTIAN CORNER observed during the October 15, 2019 undercover transaction.

32. As the result of the investigation, the following items were seized:

    a. $44,149.32 in funds seized from First Mid Illinois Bank & Trust Account No. 2028;

    b. $23,866.50 in funds seized from First Mid Illinois Bank & Trust Account No. 7401;

    c. $4,571.84 in funds seized from First Mid Illinois Bank & Trust Account No. 7115;

    d. $20,185.02 in funds seized from Banterra Bank Account No. 6855;

    e. $279,363.00 in United States Currency;

    f. $2,800.00 in United States Currency;

    g. $4,252.00 in United States Currency;

    h. $4,009.25 in United States Currency; and

    i. $4.068.05 in funds seized from SIU Credit Union Account No. 9007.

33. Based on the foregoing, declarant believes that the items described in paragraph 32a–i represent funds constituting or derived from proceeds of violations of Title 7, United States Code, Sections 2024(b) and (c) (Food Stamp Fraud); Title 18, United States Code, Section 371 (Conspiracy); Title 18, United States Code, Section 1343 (Wire Fraud); and Title 18, United States Code, Section 1956 (Money Laundering) and said funds are subject to forfeiture pursuant to 18 U.S.C. ' 981(a)(1)(C).

34. Pursuant to 28 U.S.C. ' 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 20TH day of April, 2021.

13

_____
Steven Jeschke
Task Force Officer
Federal Bureau of Investigation

14